IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
November 10, 2025
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

NATALIE C.,[1]                          )
                                        )
    Plaintiff                       ) Civil Action No. 7:24-CV-791
                                        )
v.                                      )
                                        )
FRANK BISIGNANO, Commissioner of        )
Social Security,[2]                     ) By: Michael F. Urbanski
                                        ) Senior United States District Judge
                                        )
    Defendant                       )

## MEMORANDUM OPINION

Plaintiff Natalie C. ("Natalie") filed this action challenging the final decision of the Commissioner of Social Security granting in part and denying in part her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§ 423 and 1381a. In support of her application, Natalie argues that the determination of the administrative law judge ("ALJ") that she was not disabled after December 7, 2015, is not supported by substantial evidence. Pl.'s Br., ECF No. 15. The Commissioner filed a response in which he argues that substantial evidence supports the Commissioner's determination. Comm'r's Br., ECF No. 16.

As discussed more fully below, the court finds that substantial evidence supports the ALJ's determination that Natalie was disabled for a closed period from May 1, 2013, through

---

[1] Due to privacy concerns, the court adopts the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. In accordance with Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), he is substituted as defendant.

December 7, 2015, but not thereafter. Accordingly, the Commissioner's determination that Natalie is entitled to disability benefits for the closed period of May 1, 2013, through December 7, 2015, is **AFFIRMED** and this matter is **DISMISSED**.

## I. Judicial Review of Social Security Determinations

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), and Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court will uphold a Social Security disability determination if "'(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings.'" Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023) (quoting Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 94 (4th Cir. 2020)).

A court may neither undertake de novo review of the Commissioner's decision, reweigh conflicting evidence, nor substitute its judgment for that of the ALJ. Id. Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S.

197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

Nevertheless, the court does not "'reflexively rubber-stamp an ALJ's findings.'" Oakes, 70 F.4th at 212 (quoting Arakas, 983 F.3d at 95). Remand is appropriate when the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"). See also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## II. Claim History

Natalie filed an application for DIB on January 24, 2016, alleging disability beginning on May 1, 2013. She also filed an application for SSI on February 8, 2016, alleging the same onset date. Natalie was 26 years old at the alleged onset date and sought disability based on being legally blind and having nystagmus, torticollis, esotropia, high myopia, macular atrophy, and optic atrophy in both eyes. In addition, she alleged that headaches, a learning disability, anxiety, and a stuttering problem precluded her from full-time work. R. 312, 321.

Natalie worked as a part-time cafeteria aide after her alleged onset date, but the ALJ found that her earnings were below the threshold for substantial gainful activity ("SGA"). R. 12–13. The ALJ found that Natalie's impairments of status-post strabismus surgery, optic and macular atrophy, exotropia, nystagmus, high myopia, learning disorder with impairment in

mathematics, borderline intellectual functioning, unspecified anxiety order, and major depressive disorder were severe under the regulations, but that none of them met or medically equaled a listed impairment. R. 13–14.

The ALJ determined that Natalie had the capacity to perform work at all exertional levels, except that she needed to avoid carrying boxes and other items weighing more than 25 pounds due to vision issues. She could have no exposure to hazardous machinery, and could not work at unprotected heights, climb ladders, ropes, or scaffolds, or work on vibrating surfaces. She could understand, remember, and carry out simple instructions in repetitive, unskilled work, attend, persist, and concentrate for two-hour segments with normal breaks as allowed by the employer, and complete a normal eight-hour workday and forty-hour workweek in work involving only occasional interactions with the general public, coworkers, and supervisors, although she was able to respond appropriately to supervision, coworkers, and usual work situations. She was limited to jobs requiring little or no math skills, and little or no reading due to vision issues. She could not work in a fast-paced environment, such as an assembly line. She should be permitted to use reading glasses or large fonts to do any required reading. She could not do inspection-type jobs, such as those requiring her to see debris left on plates after going through a dishwasher and could not use a monitor more than one to two hours per day. R. 16.

Natalie had past relevant work as a kitchen helper, cafeteria worker, and childcare attendant and the ALJ determined that she could not return to any of those jobs. However, based on testimony from the vocational expert ("VE"), the ALJ determined that Natalie could do the work of an assembler, packer, or laundry worker, and that such jobs existed in

significant numbers in the United States. Thus, the ALJ found that Natalie was not disabled. The Appeals Council declined Natalie's request for review and the ALJ decision became the final decision of the Commissioner. R. 1–3.

Natalie filed a lawsuit challenging the Commissioner's finding that she was not disabled. Natalie C. v. Kijakazi, No. 7:20-CV-423, 2021 WL 5149913 (W.D. Va. filed July 21, 2020). On November 4, 2021, this court vacated the Commissioner's determination that Natalie was not disabled and remanded her case for further consideration. Id., 2021 WL 5149913 at *6.[3] The court found that the ALJ had not adequately considered the fact that Natalie had been receiving services from the Department for Aging and Rehabilitative Services (DARS) since 1991 and that a job coach had been assigned to help her obtain and keep employment. Id. at *4–5. The court also directed the Commissioner to better explain why Natalie could not perform her past relevant work but could perform work with similar specific vocational preparation time and skill requirements. Id. at *5.

On remand, a different ALJ held another hearing, R. 701–32, and issued a new, partially favorable decision. R. 669–89. The ALJ found that Natalie was disabled from her alleged onset date of May 1, 2013, through December 7, 2015, at which time her condition had improved such that she was no longer disabled. R. 670.

The ALJ found that beginning December 8, 2015, Natalie had the RFC to perform a full range of work at all exertional levels but with additional limitations: She could never climb ladders or scaffolds; was able to avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles; was unable to read very small print but

---

[3] The opinion is included in the administrative record at R. 769-80.

5

could read ordinary newspaper or book print; could view a computer screen; could determine differences in shape and color of large objects but not small objects such as screws, nuts, or bolts; must avoid unprotected heights, moving mechanical parts, and operating a motor vehicle in the workplace; could use the telephone to communicate; and did not require special supervision or job coaching. R. 680. The ALJ found that Natalie did not have past relevant work because the work performed during the period at issue could not be found to be past relevant work even if it were at the SGA level of earnings. R. 687. After consulting with a vocational expert, the ALJ concluded that Natalie could perform the jobs of housekeeping cleaner, inspector and hand packager, and a change house attendant, all of which exist in significant numbers in the national economy. R. 688. Accordingly, he found Natalie not disabled since December 8, 2015. Id.

Natalie sought review by the Appeals Council, which found no reason for it to assume jurisdiction and no basis for changing the hearing decision. R. 658–62. She then filed this lawsuit.

### III. Evidence

### A. Vision Impairment

On October 22, 2013, Natalie was diagnosed with nystagmus, esotropia, torticollis, and high myopia in both eyes. The ophthalmologist explained that Natalie had an ocular muscle abnormality which meant her eyes were not straight and did not work together. The condition interfered with normal visual function and caused symptoms such as double vision, loss of depth perception, and loss of the functional peripheral visual field. The doctor recommended

that Natalie undergo surgery to correct the muscle abnormality. R. 427. On January 6, 2014, Natalie had the corrective surgery. R. 421–22.

On February 4, 2014, the ophthalmologist noted that he was happy with the surgical result and recommended no further intervention. R. 420. On November 4, 2014, Natalie's eye exam was stable with no significant changes from the previous visit. She was given a new prescription for glasses and contact lenses. R. 418. On December 11, 2014, Natalie reported that her vision had been better with her previous glasses prescription. Following examination, it was determined that Natalie would go back to her old glasses prescription but without the prism. R. 561–66.

Natalie was evaluated for new contact lenses on February 19, 2015. She reported that the contact lenses were very comfortable and her vision binocularly was 20/40. She was advised to wear the lenses no more than eleven to fourteen hours per day. R. 557. On July 10, 2015, at an annual eye exam, Natalie was wearing contacts and doing well. At her eye exam on July 26, 2016, Natalie was wearing her contact lenses and reported no diplopia and no changes or concerns. R. 543.

On August 21, 2017, Natalie was doing well with her contact lenses. She had no diplopia and no other concerns. R. 632. In August 2018, it was noted that Natalie's exotropia and nystagmus were stable and she had no changes in vision. She was wearing her contact lenses most of the time and otherwise wore her glasses. R. 641–47. At her contact lens exam on September 26, 2018, Natalie reported that she was happy with her lenses and that they were comfortable and felt good. She was advised to wear them no more than eleven to fourteen hours per day. R. 649–51. On October 31, 2019, Natalie reported that her vision was stable,

she was happy with her contact lenses and glasses, and she had no pain or irritation. R. 1047. On October 26, 2020, Natalie reported that she typically wore her contact lenses eleven to fourteen hours per day. R. 1054–55.

On October 27, 2021, Natalie denied any changes in vision and reported no pain, discomfort, redness, dryness, flashes, or floaters, but did report that she wore her contact lenses no more than eight hours at a time because of dryness. R. 1057. The ophthalmologist noted bilateral retinal lattice degeneration, which put her at higher risk for retinal tears or retinal detachment. No treatment was required but Natalie was advised to call if she experienced new floaters or flashes. R. 1062–63.

On November 2, 2022, Natalie was diagnosed with left retinoschisis but she was asymptomatic and was advised to monitor her vision. The bilateral lattice degeneration was documented, and Natalie was instructed to call the office if she experienced vision changes. R. 1074–75. In 2023, Natalie reported no changes in her vision R. 1078–82.

On February 24, 2023, the ALJ asked a medical expert to complete medical interrogatories regarding Natalie's vision. R. 1095. The expert found that Natalie's corrected functional vision was in the 20/50 to 20/70 range in one eye or the other. R. 1097. His opinion was that such visual acuity represented only a mild limitation and should be sufficient to perform a wide variety of tasks including work requiring occasional reading. However, jobs requiring very fine vision or prolonged visual work, described as two to three hours without a fifteen-minute break, could be problematic. That limitation could be accommodated by allowing Natalie a fifteen-minute break after two or three hours of work. R. 1097.

## B. DARS Services

Natalie started getting help for school from DARS in 1991 when she was a very young child. R. 321. As an adult, from January 11, 2012, through December 7, 2015, Natalie received ongoing assistance from DARS in the form of coaching in how to prepare a resume and cover letter, apply for a job, and dress for an interview. The counselor researched openings at jobs in which Natalie had indicated interest and took her to submit applications. R. 470–87. In April 2012, with the help of her counselor, Natalie obtained a job as a food and nutrition associate in a school district. R. 468–69. Natalie did well at the job until February 2013, when her counselor learned that Natalie was telling outlandish stories at work and engaging in paranoid behavior. In April 2013, Natalie was placed on administrative leave. R. 461–63.

In July 2013, Natalie obtained another job at a skilled nursing facility. A job coach from DARS spent time at the job site to support her in learning the duties. Natalie was responsible for placing condiments and utensils on trays and for advising the cook of the correct diet for the resident's tray. She struggled reading small print and developed a headache by the end of her shift from trying to read the small print. R. 456. By November 2013, Natalie was doing so well at the job that she entered the "follow along" program, which included twice-monthly monitoring at the worksite and off-site monitoring when appropriate. R. 445–48. DARS services were terminated on November 21, 2013. R. 444.

In September 2014, Natalie resigned from her job at the skilled nursing facility and DARS reopened her case. In October 2014, Natalie began working in a high school cafeteria as a dishwasher. DARS provided a job coach who was onsite with Natalie on three occasions.

R. 441. Natalie adjusted well to the job and in January 2015, Natalie agreed to DARS transitioning her to "follow along" status. R. 436–42.

Natalie was laid off from her job at the high school in March 2015, but began a training program with the local police department. Her tasks included shredding documents, filing fingerprint cards, and doing data entry. The counselor noted that Natalie's vision impairment made it difficult for her to read the fingerprint cards. A magnifier was available, but Natalie refused to use it. R. 434.

In September 2015, Natalie was hired at a middle school cafeteria and a job coach was assigned to her. Although the job coach helped her with the basic count of food that went onto the trays, Natalie was confident and worked well with the other employees. She relied on her own communication skills when she had a question or attempted to problem solve on her own but reached out to her counselor when she exhausted her jobsite resources. R. 431. Natalie continued to do well, and on December 7, 2015, her DARS case was closed because she had done so well in her new job. R. 429–30.

More than six years later, on March 24, 2022, Natalie reported that she had quit her job at a school cafeteria because it was too stressful. R. 1035. That same month, Natalie was reevaluated for DARS services and qualified for counseling and guidance in her job search and for assistance with job readiness skills. R. 956–64.  In September 2022, Natalie reported that she had been hired at a skilled nursing facility. R. 1040. Records from DARS indicate that Natalie started at the facility on July 6, 2022, and was described as stable on September 20, 2022. According to her job coach, Natalie was ready for "follow along" and would not need support as of October 2022. R. 974.

### C. Mental Health Care Providers

On April 1, 2015, Natalie underwent a psychiatric evaluation to update her cognitive and academic information and to assess her current level of emotional functioning in the context of her vision problems and her history of having a learning disability. R. 517. Natalie reported a history of anxiety and depression for which she was taking Lamictal which helped with her symptoms. Id. She graduated from high school with a modified standard diploma and obtained an associate's degree in early childhood development, having received accommodations in the form of a note-taker, preferential seating, and the option of recording class lectures. R. 518.

Testing showed word reading at grade level 5.4, sentence comprehension at grade level 7.0, spelling at grade level 7.2 and math computation at grade level 3.2, with her low math score possibly attributed to vision problems. R. 518–19. She had a full-scale IQ score of 73, which was within the lowest limits of the borderline range for people in her chronological age group. R. 519. Her anxiety score was mildly elevated, but her self-esteem score was not. R. 520. The psychologist stated that Natalie would likely need assistance learning a new job; would not be able to work effectively in a job requiring mechanical reasoning skills, good problem-solving skills, or decision-making skills, would have difficulty working in a job requiring rapid tracking of information, such as in an assembly or production capacity, would need to avoid jobs requiring her to sit at a computer for more than an hour, unless the images were enlarged, and might be able to work in a clerical position that did not require her to focus continually on written information. Natalie was assessed with a specific learning disability with an impairment in mathematics and a mild unspecified anxiety disorder. R. 522.

In January 2016, Natalie began to see a psychiatrist. Natalie reported that she was doing well, and that she had a new job and liked it. She was happy taking Lamictal and believed it helped her. Her mood was good and her mental status exam was unremarkable. R. 618. Natalie continued to see the psychiatrist from 2016 through 2022 for medication management and with very few exceptions, she consistently reported being happy and in a good mood and her mental status exams were within normal limits. R. 623–24, 639–40, 652–57, 1012–13, 1016–29, 1034–43. On two occasions she reported situational stress related to a staff shortage at work, but her mental status examination remained within normal limits. R. 1030–33.

In August 2016, the psychiatrist referred Natalie to a social worker to help with coping skills and stress management. R. 573–76. Her mental status exam was within normal limits, and she reported that things were better at work with the addition of a new employee and because she no longer was working with a previous co-worker who had caused her stress. R. 577. Natalie's cognitive functions were impaired and her intellectual level was below average, but she had fair judgment and insight, and her impulse control was good. R. 585. The social worker diagnosed Natalie with a moderate intellectual disability, an unspecified adjustment disorder, and a childhood-onset fluency disorder. R. 584. From November 2016 through April 2017, Natalie expressed frustration with work or with renovations to her condo from time to time, but her examinations consistently were within normal limits. She was discharged from therapy with the social worker on April 24, 2017, with the notation that the goal of helping Natalie improve her coping strategies had been met. Her current level of functioning was described as "good." R. 572, 577–585, 595–601.

In December 2016, Natalie underwent a psychological examination by a different social worker. She reported living by herself in an apartment and having three or four friends who she saw four or five times per month. She could do most household chores, shop for groceries, cook in a microwave oven, and take care of her bills and finances. For fun she went to the mall and to the movies with friends. R. 590.

Natalie told the social worker that she had never had a full-time job because working more than 30 hours per week in the school cafeteria would cause eye fatigue which would make it hard for her to read recipes and in turn cause her stress and anxiety. R. 590. On examination, her immediate recall was moderately impaired, recent memory was within normal limits, long-term memory was mildly impaired, fund of general information was moderately impaired, computation skills were moderately-to-markedly impaired, concentration was likely moderately impaired in a work setting, insight was good-to-fair, judgment was fair, and her abstract thinking skills were moderately-to-markedly impaired. R. 592–93. The social worker opined that Natalie would be able to perform simple and repetitive work tasks and to maintain regular attendance in the workplace. She could perform work activities consistently with no more than a moderate impairment of concentration, persistence, or pace. She was at least of low-average intelligence and able to perform work activities without special or additional supervision and could complete a normal workday or workweek without interruptions from her psychiatric condition. She would be able to accept instructions from supervisors and could interact with the public in ways that did not require normal math skills. She was able to deal with the usual stressors encountered in competitive work when remaining adherent to psychiatric treatment. R. 593–54.

### D. State Agency Expert Opinions

On December 16, 2016, at the initial level of review, a state agency physician found that Natalie had the RFC to do work at all exertional levels but could never climb ladders, ropes, or scaffolds. Her near and far visual acuity were limited which could cause difficulty with fine work and small text, but she was able to avoid normal workplace hazards, although she should avoid concentrated exposure to hazards. Natalie appeared to do well using contact lenses and glasses and was able to drive in the daytime. R. 91–96, 106–11. Regarding her mental impairment, Natalie had a mild impairment in her ability to understand, remember, and apply information, and a mild impairment in her ability to concentrate, persist, or maintain pace. She would be able to perform simple and repetitive tasks and to maintain regular attendance in the workplace. She could perform work activities on a consistent basis with no more than a moderate impairment of concentration, persistence, or pace. R. 89–90, 104–105. On reconsideration, the state agency medical experts reached the same conclusions. R. 120–28, 136–44.

### E. Hearing Testimony

At the first hearing in front of the ALJ in March 2019, Natalie testified that she was born in 1986 and was 31 years old. She had graduated from high school and obtained an associate's degree in early childhood education, which allowed her to work as a teacher's aide. R. 52–54. She had worked at a day care and as a cafeteria worker. At the time of the hearing, she was working seven hours per day, which reflected a recent increase from five-and-a-half or six hours per day. R. 54–55, 66. She could not work more hours than that because of eye fatigue caused by reading labels on cans and boxes. R. 56. When washing dishes, she could

not always see if they were clean. She had to squint a lot which made her eyes tired. She would try to rest her eyes by doing tasks that did not require her to focus. R. 57–58. She was seeing the psychiatrist approximately every six months for medication for her anxiety. She had been seeing a therapist but stopped because she felt like she was doing better. R. 59–60.

Her coworkers helped her with tasks involving math. Natalie had issues running into things like drawers or slipping on spills because she would not see them in time to avoid them. R. 61–62. She could drive but was restricted from driving at night. R. 63. She prepared meals, cleaned her house, and went on walks for pleasure. R. 64. Her learning disorder caused her to have problems with math but not in other areas. R. 64–65.

She could not wear her contact lenses for more than six-and-a-half hours because her eyes got tired and caused headaches. In addition, her vision would become blurry. She could take out her contact lenses and wear glasses, but her she could not see as well. R. 65, 68. Working more than six hours per day also caused general fatigue. R. 67. She needed very bright light in her work environment to be able to see. In dim light, she had to squint and it made her eyes tired. R. 69–70.

At the second ALJ hearing held in February 2023, it was noted that Natalie had been working as a dining room attendant at a skilled nursing facility since June 2022. R. 704. She carried plates and drinks to the tables for residents and cleared and reset the tables as needed. She was working six-hour shifts for approximately twenty-four hours per week. R. 705.

Natalie did not think she could work more hours because of eye fatigue, which made her eyes feel heavy and caused her to not see as well. She would start to squint which caused headaches. R. 709–10. Natalie testified that her ophthalmologists have told her that "six hours

is probably the most I could wear them." R. 711. She could put her glasses on at that point, but does not see as well in them. R. 711–12. When her eyes get tired it causes her to slow down at work. R. 719. When she is wearing the contact lenses, she can see hazards on the floor if the room is well lit. R. 721.

Natalie had quit her job in the high school cafeteria because they were giving her more hours and more duties, which caused eye strain and headaches. R. 712–13. While she was working at the high school, she continued to receive assistance from DARS, although there were no onsite visits. She talked to her counselor over the phone, and the counselor helped her get her current job at the skilled nursing facility, and had also helped her obtain her previous jobs. R. 714–15. At her current job, the counselor was onsite with her every day for the first three weeks. R. 718–19. She still has anxiety and depression which cause her to feel nervous and she avoids talking to people. R. 722.

She has a driver's license but is restricted to daylight driving and must wear her corrective lenses. She tries not to drive when it is cloudy or raining outside. R. 723. She lives alone and needs no help with her daily activities. When she is not at work, she watches television or does household chores. R. 724. She has no limitations in how long she can watch television, but when her eyes get tired she turns off the television. She described her television as having a larger screen. R. 724–25. She drives herself to work and to the grocery store when the weather is good, but someone else usually takes her to her medical appointments because the driving distance is longer. R. 726–27.

Although she graduated from high school, she received a modified diploma and she had an IEP based on her learning disability. R. 728. When she was getting her associate's degree, she got extra time on assignments and tests and she had a counselor. R. 728–29.

The VE testified that Natalie's work at the skilled nursing facility was classified as light and unskilled, with an SVP of 2. R. 730–31. Approximately five months after the hearing, a VE completed a vocational interrogatory at the behest of the ALJ in which he was asked to consider the following:

> Assume a hypothetical individual who has work experience within the past 15 years as a Kitchen Helper, Cafeteria Worker, Childcare Attendant, and Dining Room Attendant – with some of the work performed part-time as well as some of the work performed under special supervision and/or with direct job coaching assistance. Assume that hypothetical individual was born on August 11, 1986, and has a high school education as defined in 20 CFR 404.1564 and 416.964 as well as has some education beyond the high school level. Assume further that this individual has the residual functional capacity (RFC) to perform work at any exertional level (i.e. no exertional limitations); can never climb ladders or scaffolds; is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles; is not able to read very small print; is able to read ordinary newspaper or book print; is able to view a computer screen; is able to determine differences in shape and color of large objects but not small objects such as screws, nuts or bolts; must avoid unprotected heights, moving mechanical parts and operating a motor vehicle in the workplace; is able to use a telephone to communicate; and does not require special supervision or job coaching assistance.

R. 1000. The VE stated that such a person could do the work of a housekeeping cleaner, an inspector and packager, and a change house attendant. R. 1001. She could maintain employment if she were absent from work up to one day per month and off-task up to one day per month. R. 1002.

17

## IV. Analysis

In this case, the ALJ found Natalie disabled for a closed period, from May 1, 2013, to December 7, 2015, but no longer disabled after that period. In <u>Dowling v. Comm'r of Soc. Sec. Admin.</u>, 986 F.3d 377, 382–83 (4th Cir. 2021), <u>superseded by regulation on other grounds as stated in</u> <u>Drumgold v. Comm'r of Soc. Sec.</u>, 144 F.4th 596 (4th Cir. 2025), the Fourth Circuit summarized the eight-step procedure for determining whether the recipient of disability insurance benefits continues to be disabled:

> (1) Is the claimant engaging in substantial gainful activity? If yes, the disability has ended. If no, proceed to step two. (2) Does the claimant have an impairment or combination of impairments which meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If yes, the disability continues. If no, proceed to step three. (3) Has there been medical improvement as shown by a decrease in the medical severity of the impairment(s) that existed at the time of the most recent favorable disability decision? If yes, proceed to step four. If no, proceed to step five. (4) Is the medical improvement related to the ability to work, i.e., has there been an increase in the claimant's RFC? If yes, proceed to step six. If no, proceed to step five. (5) Do any of the exceptions set out in 20 C.F.R. § 404.1594(d) or (e) apply? If none of them apply, the claimant's disability continues. If one of the first group of exceptions to medical improvement applies, proceed to step six. If one of the second group of exceptions to medical improvement applies, the claimant's disability has ended. (6) Is the claimant's current impairment or combination of impairments severe? If yes, proceed to step seven. If no, the disability has ended. (7) Does the claimant possess the RFC to perform her past relevant work? If yes, the disability has ended. If no, proceed to step eight. (8) Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow the claimant to do other work? If yes, the disability has ended. If no, the disability continues. <u>See id.</u>[4]

---

[4] The eight-step analysis applies in DIB cases. In SSI cases, whether the claimant is engaged in SGA is not considered. The remaining sequential factors for both types of claims are the same. <u>Heffner v. Comm'r, Soc. Sec. Admin.</u>, No. 2:16-cv-820-TMC-MGB., 2017 WL 9292242, at *2 (D.S.C. Aug. 3, 2017).

While the medical improvement regulations address continuing review of benefits cases, courts have held that the regulations also apply to closed period cases, such as this one, where an ALJ has found that a claimant was disabled for a time after the alleged onset date, but had medical improvement such that she became able to work. McKenzie v. Colvin, No. 9:14-4816-RMG-BM, 2016 WL 182924, at *4 (D.S.C. Jan. 4, 2016) (collecting cases). The burden is on the Commissioner to come forward with evidence that that a claimant's condition has improved. Pack v. Heckler, 740 F.3d 292, 294 (4th Cir. 1984). See also Chrupcala v. Heckler, 829 F.3d 1269, 1274 (3rd Cir. 1987) ("Fairness would certainly seem to require an adequate showing of medical improvement whenever an ALJ determines that disability should be limited to a specified period.").

Natalie's case hinges on the ALJ's findings at Steps 3, 4, and 8, that she has experienced medical improvement related to her ability to work and that the medical improvement resulted in her being able to do other work in the economy. See R. 677–80. As set forth above, the ALJ found that Natalie was disabled from her alleged onset date of May 1, 2013, through December 7, 2015, at which time her functional capacity for basic work activities had increased such that she was no longer disabled. In comparing the RFC assessment for the period from May 1, 2013, through December 7, 2015, with the later period, the only difference is that the RFC for the earlier period included Natalie's need for job coaching assistance at the job site, R. 675, and the RFC for the later period stated that she did not require special supervision or job-coaching assistance. R. 680. The ALJ explained that for the earlier period, the active involvement of the job coach indicated a level of necessary supervision that precluded

competitive employment on a regular and continuing basis for eight hours per day, five days per week. R. 677.

Natalie argues that the ALJ did not meet his burden of establishing medical improvement because his assessment of Natalie's RFC is not supported by substantial evidence. She also argues that the ALJ did not properly assess Natalie's subjective allegations of the limitations caused by her vision impairments. These arguments are addressed together, because they depend on the notion that had the ALJ fully credited Natalie's testimony at the hearings, he would have found that eye strain and headaches caused by limited visual acuity left her unable to work more than six hours per day. The Commissioner responds that the ALJ's determination is supported by substantial evidence.

The process for assessing a claimant's RFC is set forth in SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996). The ruling sets out in relevant part the following:

> The RFC must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may the RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

Id. at *1. Physical abilities set out in 20 C.F.R. 404.1545(b) and 416.945(b) include sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching. Mental abilities set out in paragraph (c) of the regulation include understanding, remembering, and carrying out instructions, and responding appropriately to supervision, co-workers, and work pressures in a work setting. Other abilities set out in paragraph (d) of the regulation include those affected by skin impairments or epilepsy, impairment of vision, hearing, or other senses, or impairments which impose environmental restrictions.

The RFC analysis must include a narrative discussion describing how the evidence supports each conclusion. The ALJ must cite specific medical facts such as lab results and nonmedical evidence such as daily activities and observations of the claimant. The ALJ must discuss the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and describe the maximum amount of each work-related activity the claimant can perform based on the evidence in the case record. The ALJ also must explain how he considered and resolved any material inconsistencies or ambiguities in the record. SSR 96-8P, 1996 WL 374184 at *7.

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)), the Fourth Circuit rejected a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis. However, the court went on to find that remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrates meaningful review." Id. (citing Cichocki, 729 F.3d at 177).

When evaluating a claimant's reported symptoms, the ALJ first considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. Once an underlying physical or mental impairment is established, the ALJ evaluates the intensity and persistence of symptoms to determine the extent to which the symptoms limit a claimant's ability to perform work-related activities. Social Security Ruling 16-3P Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) ("SSR 16-3P). In making the second

determination, the ALJ first looks at the objective medical evidence. Id. at *5. If the ALJ cannot make a disability determination that is fully favorable based on objective medical evidence, other evidence, such as statements from the claimant, medical sources, and other sources are considered. Id. at *6.

Stated differently, the finding that an impairment could reasonably be expected to produce pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the symptoms. 20 C.F.R. § 404.1529(b). The adjudicator is directed to consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between a claimant's statements and the rest of the evidence, including the claimant's history, the signs and laboratory findings, and statements by medical sources or other persons about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(c)(4).

**A. Job Coach**

Natalie argues that the ALJ did not explain how he arrived at his conclusion that she no longer needed a job coach after December 8, 2015. Natalie testified that she had obtained her latest job at the skilled nursing facility with the assistance of DARS, that the job coach was onsite for three weeks, and that she continued to talk to the job coach via telephone. She also argued that she was not entirely independent with communication and work speed as of the February 2023 hearing.

However, the ALJ cited to the record to support his determination that Natalie no longer needed a job coach. As part of his assessment of Natalie's limitations in the mental health domain of concentrating, persisting, and maintaining pace, the ALJ noted that DARS

closed her case in December 2015 because Natalie was doing well, and she continued to function in her job without indication of significant help from a job coach. R. 678. The ALJ acknowledged that Natalie had assistance from a job coach to get acclimated at the skilled nursing facility in 2022, but subsequently just checked in with the job coach on the telephone occasionally. R. 681.

In addition, the ALJ cited evidence from the record that Natalie's therapist terminated therapy in April 2017, finding it was no longer necessary; that Natalie was able to function for several years in her position and did not stop until her role changed and her duties increased; that in January 2020, she was promoted to the lead cook but quit the job in 2022 due to stress, but a short time later, obtained a similar job at a retirement facility; that there were generally no abnormalities in psychiatric visits or counseling visits; and that her ability to cope with difficult coworkers increased over time. R. 678. In addition, the ALJ observed that at the second hearing, Natalie said she was limited to part-time work because of vision difficulties rather than psychological issues. Id.

Based on the ALJ's explanation and citation to the evidence, the court is not left to guess at how he reached his conclusion that Natalie did not need a job coach after December 7, 2015, despite receiving DARS services briefly in 2022. Accordingly, the court finds that the ALJ's opinion regarding Natalie's medical improvement as of December 8, 2015, is supported by substantial evidence.

### B. Vision Impairment

Natalie also argues that the ALJ did not adequately account for her vision impairment in his RFC. She points out that while the ALJ gave significant weight to the opinion of the

medical expert who found that her vision was in the 20/50 to 20/70 range with her contact lenses, Natalie testified that wearing the lenses for more than six hours caused eye strain and headaches. However, the ALJ cited to Natalie's testimony, but also cited to the record where Natalie repeatedly told eye specialists that her contact lenses were comfortable and she had no concerns. Eye specialists told her to wear the lenses no more than eleven to fourteen hours per day, and on one occasion it was noted that Natalie reported wearing her contacts for eleven to fourteen hours on average. In April 2015, Natalie told a mental health care provider that she experienced eye fatigue if she looked at a computer screen or read for an extended time, but the later record did not indicate issues with eye fatigue. The ALJ further noted that the record does not indicate a significant problem with headaches. In addition, no vision specialist limited Natalie to six hours of work due to eye fatigue. R. 687. The court finds that the ALJ adequately explained why Natalie's testimony was not fully consistent with the record.

Natalie also objects that the ALJ did not explain why he did not fully adopt opinions by the state agency experts that Natalie had limited capacity for both near and far acuity. This is an incomplete reading of the experts' opinions. While the experts found that Natalie had limited near and far acuity, they further found that with corrective lenses, her visual fields were full to finger counting but she still might have difficulty with fine work or small text. R. 92, 125. The only RFC limitation the experts provided was that Natalie should avoid concentrated exposure to hazards like machinery and heights. R. 93, 125–126. The reason the ALJ gave this opinion only some weight was because he found that Natalie needed an additional limitation regarding fine print. R. 687. In other words, the ALJ imposed a greater RFC limitation than that imposed by the agency experts.

Natalie also claims that the ALJ failed to conduct a function-by-function analysis and failed to make any specific findings regarding Natalie's headaches and eye fatigue. However, as discussed above, the ALJ found that Natalie's statements regarding her symptoms were not entirely consistent with the medical records, which contain no reports of eye strain or headaches related to wearing her contact lenses longer than eight hours. R. 687. It is the province of the ALJ to resolve conflicts in the evidence, and pointing out the lack of medical documentation of headaches and eye fatigue suffices as substantial evidence supporting the ALJ's determination that Natalie is not precluded from working more than six hours per day due to eye strain and headaches.

Finally, Natalie asserts that the ALJ did not explain how the 2015 eye surgery prescription adjustments improved Natalie's vision impairments to the point that she no longer was disabled after December 7, 2015. However, the ALJ's RFC assessment of Natalie's vision issues did not change from the closed period to the later period. The only difference in the RFC for the two periods was that Natalie no longer needed a job coach after DARS closed her case in 2015, despite receiving limited job assistance in 2022. R. 674–675, 680. Accordingly, this argument is without merit.

## V. Conclusion

For the reasons stated, the court **AFFIRMS** the decision by the Commissioner that Natalie was disabled for a closed period from May 1, 2013, through December 7, 2015, but was not disabled as of December 8, 2015. This case is **DISMISSED** and **STRICKEN** from the docket of the court.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: November 10, 2025

Michael F. Urbanski
Senior United States District Judge